Good morning. May it please the Court, I'd like to reserve two minutes for rebuttal, and since the time is short, I'd like to take the Court through a very brief nickel tour of the facts because I think it will be relevant to the discussion. Imagine this courtroom is a stope in the Asarco mine. Prior to these events, Asarco used to drill the floor. They'd blow up the floor, muck out the ore, and the miners were relatively safe under what looks like giant chain-link fencing on the ceiling with four-foot bolts, bolts every four feet, keeping the rocks from falling on their heads when they blow up the stope, the floor. Asarco came in, changed hands, and said, we're ripping out all of that roof, those chain-link fencing, we're ripping out all the roof bolts, and we're going to make our miners drill into the ceiling in successive 12-foot cuts, blow them up, and then go in the next day after we muck out the ore, and in a mine, imagine this courtroom, which is pitch black, so you can't see anything that your headlight doesn't illuminate, which is incredibly noisy because they're blowing air in, so you can't hear communications with other people, and which is smoky because of the heavy equipment, they tell their miners, tell you what, guys, if you're worried about one of these rocks falling on you when this thing is 24 or 36 feet, well, so what? Go up there with a crowbar and try to predict which one is going to fall on your head and crowbar it down. Well, Mr. Villanueva's daughter, Mr. Villanueva and Mr. Olson and Mr. Vargas are all experienced miners, and Mr. Villanueva is going home and saying, I'm going to die. And his daughter tries to do something. She writes an anonymous letter to the federal mine inspector and says, this is what they're doing. They're taping off the stopes so you guys don't go in and see them, and they're not using roof bolting. You got to save these miners. And the mine inspector does nothing. There's no notes whatsoever as to what he does with these. Five subsequent phone calls go into that federal mine inspector's office. There are no notes whatsoever. The only thing that the subsequent investigations reveal may have happened is Mr. Kirk may have told Mr. Varlin before the last inspection, before the tragic accident, check the ground. He may have done that. It's undisputed that he never told him, check to see if they're taping off stopes. And it is undisputed, Lee Ratliff, when Emshaw says, let's go investigate why these guys are dead, Lee Ratliff said, I could find no evidence whatsoever. That Mr. Varlin ever checked the claim that they were taping off the stopes, and Mr. Kirk, his supervisor, said, I had no idea they were doing this backstopping, which is what they are. Is all this information that you're giving us now on the first round or when it was remanded back to district court and further discovery, what was learned in the further discovery relative to these facts? Well, in the first discovery, this court had the Office of Inspector General report, which largely discussed some of these facts. The facts of what the different inspectors said in deposition was not known at that time. And so it has been supplemented. Because the district court ordered further, when it was remanded back. Right. We had six months of discovery. Okay. So can you tell me what was found out new in that new discovery? I can tell you a couple of things that are disputed, but which I can describe the testimony. Mr. Kirk said, I told Mr. Varlin to go in and check the ground at some point. Mr. Varlin says, yeah, I think he did that. Mr. Ratliff, who investigated it, says it's not clear that that's what happened because I could find no notes. But that's what they claim. Mr. Ratliff also said it is absolutely clear that there is no evidence that Kirk told Varlin to check the taping off. And in fact, there's absolutely no evidence because Kirk testified in the depositions. This was learned. He said, I had no idea this backstopping was going on. Okay. So now you have these old facts, if you will, first round. Right. You have new depositions, new facts, second round. True enough. And you're still in the position, as I understand the district court's second order, under motion to dismiss and motion for summary judgment. True. Okay. So now do we have a disputed issue of fact relative to these significant terms? We do, Your Honor, and that was leading to my first point. There are several points raised in brief, but because of timing, I want to address two. First, Autry v. U.S. required the judge to apply a summary judgment standard to these disputed facts. And it's clear, if they're disputed facts, we're entitled to the benefit of those, the doubt on those facts. And if they're material issues of fact, we're entitled to a trial on them. But the judge applied the wrong standard. And by the way, the government concedes at page 17 of their brief that Autry is the correct standard. So on the remand, Supreme Court Ninth Circuit remand, you're saying that now we're in summary judgment, he should have applied those and there was disputed issues of fact. Well, they filed a motion to dismiss on the discretionary function, motion for summary judgment on whether Arizona law recognizes the claim. But Autry requires on both of those issues, because the facts are intertwined with the facts that go to merits, that he apply a summary judgment standard. Key point you just made. The facts are intertwined between the first issue, motion to dismiss, and the summary judgment. Yes, Your Honor, and the government concedes that at page 17 of their brief. Now, does that mean that when we remanded back to the district court to explore with further discovery the tort issue, that the intertwined facts opened up the first issue, the jurisdictional question? Your Honor, I don't believe it did that. And, you know, I'm not here to tell the court. I think what the law that addresses that is what did this court intend when it remanded? What did the Supreme Court intend when it took only one issue and then vacated the court's fortune? We're going to decide that. What's your position on it? Well, my position is it was already ruled on and these additional facts in any event did nothing that made the government's position any better. And so the ruling ought to be the same even if this court revisits it. Let's break that into pieces. If, in fact, discovery had revealed a very different set of facts than was discussed by the court the first time around, I take it you would accept the proposition that the court could pay attention to the very different set of facts. I accept the proposition that there is a case cited by the government that says that, and it makes good sense. Once we're in that situation where actually everything is going to fall to the second half of your allegation, were the facts different or applying a summary judgment standard, is the evidence such that summary judgment was or was not appropriate? It's not appropriate. And, Your Honor, I'm going to go into what's thought. But first I want to say if the court will make a note to look at page nine of Judge Burry's brief, he applies the wrong standard. And he says I get to make the factual determinations here. Page nine of which? Of his order. His order. So in my ER, I think it's in both of them, it's the second tab at page nine of his order, he applied the wrong standard. And the government seems to concede at page 17 of their brief he applied the wrong standard. With regard to the motion for summary judgment? With respect to the motion to dismiss. Motion to dismiss, which would be the first page there. Is everybody with me now? I want to now talk about why it has to be a factual issue entitled to a trial. Judge Burry basically makes the decision that the M. Shaw's manual trumps the day. M. Shaw's manual says that if you don't have a signed, written complaint, then that. May I stop? You're talking about when he just said that the court may receive and consider extrinsic evidence, and doing so allowed broad discretion, is that what you're concerned about? Well, actually, what I'm saying is, he says, but may instead weigh the evidence before it and find the facts. Which is, in fact, not what Autry allows. If they're disputed facts, Autry requires a trial on the merits. You say this on page nine? Yeah, at line five. Oh, yeah, I've got it underlined. Okay. Okay. Got it. Thank you. So he's saying it's got to be this manual. That tells him what to do. And I said, well, wait a minute. You know, this is evidence. What evidence did I come up with? First, I have M. Shaw's own investigation, authored by Lee Ratliff, an acting assistant director of M. Shaw, saying that what happened was not in accordance with policy. First piece of evidence. Second piece of evidence. The Office of Inspector General report, which says that the inspector and the supervisor did not follow various M. Shaw policies and procedures. Second thing. And if you're not following policies, I submit, Your Honor, you are not acting with discretion. And third thing. Mr. Kirk was reprimanded. He was demoted. He's the supervisor. He was demoted. In doing that, J.T. Herrera, acting district manager for M. Shaw Rocky Mountain District, says, Guidance was provided to the supervisory staff on March 17, 1999. We have the date that all complaints were to be investigated immediately, regardless of the method used to identify M. Shaw. So whatever you think the 1996 manual means, the 1999 guidance at least creates a fact question whether they changed it. So that's my third thing. My absolutely favorite piece of evidence is the letter which David J. Davitt-McTier, second guy at OSHA, writes on behalf of then-President Clinton to my client Amparo Villanueva, in which he says, I want to reemphasize the agency's policy for responding to complaints by minors. That policy requires that all hazard complaints be investigated as soon as possible, not that only the ones written and signed be investigated. Does that cut into the, whenever the best evidence comes in, cut into the fact that Kirk may or may not have told Varland what? Sure. Well, there's a factual dispute what he did. But let's take, for instance, let me ask you, let me make it a hypothetical. Let me make sure that you and I are on the same page. Because that would mean that if Kirk processed, if you will, analyzed, if you will, evaluated the anonymous, and he said, well, I'll tell you what, we've got an inspection coming up. It was either April or September, I'm not sure. September. He tells Varland, September. He tells Varland, when you go in there, check blank whatever was said, then that would kind of decide that issue whether it was done properly, wouldn't it? It may well, depending on exactly what was said. Let me respond with a hypothetical I wanted to use. Say, in that conversation, Kirk says, go and cite them. You, Mr. Varland, you go and cite them. And Varland doesn't do it. Is there seriously some argument that that's barred by the discretionary function when he's been told by his boss, go cite these guys? And so now there's a dispute of fact. What did his boss tell him? It would kind of depend upon what Varland said, the reason for not citing. My point exactly. These are fact issues that should not be resolved without a trial on the merits. You made your point good because I, very frankly, reading this record, I was trying to determine where we should be on this because of the new discovery. Sure. And once you get into the new discovery, and if you do come up with disputed facts, now what do we do? Well, then you have a trial on the merits. And actually, I brought a citation, Your Honor, from another circuit. And I'm sorry, I can't put my hand up. But the case law, if you cite Autry, will say that when the discretionary function, when the facts that go to jurisdiction are disputed, you have a trial on the merits, and then you revisit that issue. Then tell me what I do with this. The bottom line of the district court order is it is ordered that defendant motion to dismiss and defendant's motion for summary judgment are granted. Both of them. That's my second issue, and that's why I'm moving pretty fast here, Your Honor. The second issue basically says Arizona law doesn't allow a cause of action here. And you need to know what Judge Berry did. Page 34 and 35 of his order, you need to look at this very closely. He did not find there was no reliance. He didn't find they didn't cause a harm. He found that M. Shaw did not do an undertaking to benefit Asarco or the minors. Okay? And that's critical. Because remember, this is an issue of Arizona law. All right? And he cites United States v. Page, which, by the way, is a case that talks about what's called the private-public-duty distinction, which used to be a basis on which government actors weren't held liable because it was a public duty rather than a private duty owed to a particular person. Arizona does not follow that doctrine. And the case is in our brief. It's Ryan v. State. But Judge Berry basically relied on a case from a district out of the state for a proposition that Arizona doesn't follow. Well, it's a Tenth Circuit case. Yeah, well, we're not in the Tenth Circuit. And Ryan v. State is an Arizona Supreme Court case. Arizona does not follow the public-private distinction standard. But he's talking about there the safety activities of the government versus what the tort liability is. And he uses that to conclude that when Asarco goes in and does this inspection, it's not doing anything for Asarco. It's not doing anything for the minors. And, frankly, I don't understand that analysis. And I'm moving fast, but I've got something to say on that. 801G, MSHA statute, 30 U.S.C. 801G. It is the purpose of this chapter to establish standards to protect the health and safety of the nation's coal or other minors. So the purpose is to protect the safety of minors. Why do they do inspections? Authorized reps of the Secretary, that's MSHA, shall make frequent inspections for the purpose of determining whether an imminent danger exists and determining whether there is compliance with the mandatory health or safety standards. So they go out to see, are these minors in imminent danger? Are they complying with these standards we adopted for the minor? And what is it, even in Judge Burry's own order, he cites 801G, which is the initial MSHA, 801A, says, the first priority and concern of all in the coal or other mining industries must be the health and safety of its most precious resource, the minor. I know you're going fast, but we have to understand. What were you reading from now? The statute, the MSHA statute, 30 U.S.C. 801G. Now, is that, the statute also provides mandatory four-time year full mine inspections? It does. My point only that the judge takes and basically goes through, and I know it's a complicated analysis, but turns it on its head to say that a SARCO, when it goes in to inspect for the purpose of ensuring the safety of minors, is not engaged in an undertaking for either a SARCO or the minor. And the reason that's relevant is under the Restatement Second of Torts, Section 323, if it's an undertaking to benefit the minors, then there's liability. And under 324, if it's an undertaking to benefit a SARCO that you should realize would benefit the minors, then there is liability. What Judge Burry finds is it's neither of those things, and so he doesn't even reach the reliance issue, whether there's evidence of reliance. And with all due respect to Judge Burry, that analysis, that it is not on behalf of the minors or a SARCO, is nonsense. 323 and 324, if you look at the reporter's notes, specifically actually cite to a case, which is in our brief called State v. Clymer, which is a mine inspector case. And they make the point that under State v. Clymer, when the State of Tennessee, pretty sure it's Tennessee, sends an inspector in there and the inspector is negligent, a cause of action that mine inspector can be, the injured person has a cause of action, because that kind of undertaking is an undertaking that benefits the class of minors. And that's Arizona law. And the reason Judge Burry gets it wrong, with all due respect, is because he relies on U.S. v. Page, which adopts this public-private duty distinction that Arizona doesn't recognize. And, again, it first played with the restatement of Torch 323. Then when he gets to the 324A, he then does not cite any Arizona law. I agree with you there. But he does cite the United States v. Page. You see, that's where his error is. Yeah, because it adopts a rule that it's not in Arizona, which, by the way, if you're going to ask me about Reimer and Myers and all those cases, they are all public-private duty distinction cases that are not Arizona law. Arizona law is what controls here. The public-private duty distinction is basically if somebody owes a duty to the entire public, like, for instance, a government inspector, used to be, because, you know, as a remnant of sovereign immunity, you weren't liable to the entire public. Only if they took a step to provide a form of special relationship with particular individuals, then you'd have a private duty. And that was called the public-private duty distinction, which apparently is recognized in U.S. v. Page, has not been the law in Arizona for 30 years, State v. Ryan. You know, it just doesn't apply in our state. In the Supreme Court remand, we were supposed to look what the liability of an individual would be in Arizona. That's right. And apparently this ‑‑ I'm going to read this again. I'm quickly referring to my notes. But here he seems to look at the organization Kirk and Barlin being part of the organization of government and whether the government would be liable. And are you saying that's where he misstated on Page? Well, the public-private duty distinction comes out of government liability. But my point is, whether you're a public inspector, whether you're an insurance company inspector, whether you're a work comp, any of those people who provide a safety inspection does so on behalf of the class of people who are protected by that safety inspection under the restatement and under Arizona law. And the case that Judge Bury relies on finds an exception to that rule because of what used to be a government immunity exception, U.S. v. Page. And so if the court wants to actually then get to, okay, well, say Judge Bury's wrong on that, what do we say? Is there any evidence of reliance? And there's lots of evidence. First, I have affidavits from the people involved that they relied on MSHA. Secondly, I have the testimony, this also came out new in the discovery, of the MSHA inspector, Mr. Barlin, that said, yes, it's entirely reasonable that these people rely on us and anticipate that we will fix the safety problems or we will cause to be fixed the safety problems that we find in this mine. Then I have the notice of termination or, yeah, termination where Barlin is terminated by J.P. Herrera. He writes a letter saying, you as the mine inspector are relied on for the safety of all of the miners in those mines you inspect. And then when Barlin appeals that to a guy named Irwin Hooker, who is an actual district manager, J.P. Herrera was an acting district manager, there is another letter, and all of these are in the ER, saying you are relied on. So everybody who has actually testified in this case or provided documentary evidence says these guys rely on the mine inspectors. And so there is a triable issue of fact under 324A unless you run into the public-private distinction, which isn't Arizona law. And, again, under 324A, it relies on the reporter notes, state decliner, on a mine inspection case. So you don't need to worry about that. So your short answer here, or what I understand you're saying, is we reversed because he improperly granted summary judgment, number one. I don't know about the motion to dismiss, but the grant summary judgment sounds like we have disputed issue facts, got to go back. That's right. But on the motion to dismiss, we have disputed issues of fact, too, and the summary judgment standard should have applied. Same thing. The courts have simply adopted the motion to dismiss terminology but recognize in our case law that those are really factual questions that have to be evaluated as if there were a motion to dismiss. That's correct. And that case law is cited in our briefs. And the only other thing, as I say, if you actually look at the record, you might decide that reasonable people couldn't differ and rule in our favor because I'm pretty darn sure when you fire the inspector, you demote the other guy, and the president tells him to write you a letter saying how sorry they are that these guys violated policy, maybe reasonable people couldn't come to the opposite conclusion. Thank you. Okay. We'll hear from the government. Good morning, Your Honor. May it please the Court, Sergeant Donnelly from the United States. The district court here correctly concluded that the challenged actions fell squarely within the discretionary function exception. I think the most important case for us, and I think this case is virtually indistinguishable from the Supreme Court's case in Verag Airlines, in which the court said where an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. And that's, of course, exactly what MSHA is doing here. It is determining the extent to which it will supervise the safety procedures. Moreover, the court went on to say … You have a body of evidence here that looking backwards, granted it's after the fact and everybody's trying to make nice to the victims and cover their backside and say it wasn't my fault, but you have a pretty substantial body of evidence that suggests that these guys did what they weren't supposed to do, and the agency wasn't trying to say it could pick and choose what kind of inspection it would do at a time like that. I actually don't think that's correct, Your Honor. I think that the MSHA policies all along have been very clear that the mine inspectors, Varland here, and the supervisors, Kirk, have ample discretion in how to deal with … They're two separate sort of things that they're challenging. One is Kirk's decision not to order an immediate investigation. I should point out that their challenge to Kirk's action is really about the timing of the inspection, because the September 1999 investigation, of course, happened before the January 2001 — the January 2000 accident. And so it's really about the immediacy of it. Well, do we run into — let's get right down to it. Do we run into a disputed issue of fact on the facts that were ultimately determined with the first factual determinations and the subsequent discovery that there's a disputed issue of fact of what was told by Kirk to Varland? Kirk to Varland? Well, it's undisputed that Kirk told Varland about the complaints and asked him to look into them in his next investigation. And the tapes, the taped-off areas? The taped-off areas is — it's not clear whether he told him about that, but that's not relevant. Again, what's important is … No, but that's the one that fell in. It's — there's no requirement for Varland to have gone into taped-off areas, because … Well, explain that to me. Well, look, taped-off areas are taped-off oftentimes. In fact, and I'm sure regulations require this, if they're unsafe. And Varland, you know, had discretion as to whether to go into barricaded areas or not. When this case went back on remand, there was ample discovery about this. There was the — Robert Friend, the MSHA deputy assistant secretary, testified that inspectors generally do not go into barricaded areas because of safety concerns.  Number one, am I understanding correctly that the law requires the mine to be fully inspected four times a year? It says, in its entirety. But it does not — what it does not say is, in its entirety, including areas that have not been used. In this case, this particular stope, Stope 215 North, hadn't been used in two years before the accident. Is there an obligation to find out whether the taped-off areas have been used, which they were? This is — that's not the — the relevant question is whether Varland had discretion. When he was on his mine inspection. And there's no question that he had discretion. Notwithstanding the order — any orders — There is a question because, number one, he wasn't told to do it. And, two, inspecting the entire mine doesn't leave any discretion, does it? It absolutely leaves discretion. What we have to look for for mandatory directives is a specific mandatory directive. Is there anything that says you don't have to inspect the taped-off areas? Absolutely. MSHA has had consistent interpretations of the entire mine. When the act says you have to inspect the entire mine, they say what that means is you focus on the areas that are actually being used. These mines are enormous operations. Focus on what's being used. That's correct. This means that if it's been taped off, it isn't being used. Well, the thing is a mine inspector has to have discretion to determine whether a particular area is mined. They, of course, have discretion to go into areas that have been barricaded. But they have to have discretion to decide whether they're going to go into that area that's been barricaded off or not. Because based on what they see on the ground. And if they have that discretion, the Supreme Court in Galbert has made it clear that it must be presumed that if there is discretion, that the agent's acts are grounded in policy when exercising that discretion. That's core discretionary function. Where did the accident take place? Was it an area that was taped off at the time of the inspection? At the time of the inspection, it hadn't been used in two years. That's at Excerpts of Record, tab 10, page 40. It's the report of MSHA that discusses, and their second amended complaint discusses this as well, that this particular area hadn't been used in two years. It's undisputed that this area hadn't been taped off as Varland was walking up, that this area hadn't been used in two years. And two weeks before the accident in question, ASARCO opened up this area again, 215 North, opened up this area again to allow the miners to go back in. And so, you know, there's no dispute here that... Two weeks before what? Two weeks before the accident took place in January of 2000, this particular area where the accident took place opened up again. And so at the time of the inspection of September 1999, for nearly two years, this particular area hadn't been used. And there can't be. It's simply illogical to have a requirement that areas that haven't been used in years and sometimes, you know, in ten years or decades, these are enormous operations again, that those every inch of even unused areas have to be investigated. That's simply illogical. We're making this argument for the last some minutes. To what issue does this argument pertain to? Does it pertain to the motion to dismiss, or does it pertain to summary judgment? And what precise issue does it pertain to? Does it have anything to do with the jurisdiction? Well, it pertains to the discretionary function question, whether Varland was acting in a discretionary manner when he was investigating the mine. Let's assume that your argument is adhered to. I'm just saying for point of argument. And we find that that was discretion. Then what's the next analysis? If there was discretion, then the question is whether it was the kind of discretion that was grounded in policy considerations. That's the second prong of Galbert, and I'm happy to talk about that. I think, you know, and again, as Galbert noted, that it's presumed that when an agent is acting with discretion that it's exercising the policy. And the policies of the statute, of course, are. Let's assume that he was exercising the policies. Now what? Well, then there's no jurisdiction. Because an exception to the waiver of sovereign immunity. Exactly correct, Your Honor. Can't we decide that the other way in the first case? That's correct, Your Honor. But that opinion was vacated by the Supreme Court. And they haven't really grappled with the fact that the Supreme Court's cases are clear that when a court of appeals. . . Doesn't that run us into the law of the case problem? No, because once a case has been vacated, then it has no precedential effect anymore. And, of course, in any event, on remand. . . We've seen citations that cite a case and then say vacated or reversed on other grounds. I mean. . . It's not usual to see such citations. Absolutely, Your Honor. But it's not law of the case. In that case, it may be persuasive authority. And this Court certainly can look at that. I would point out in the earlier case, this issue of what the Court really went on was the meaning of in its entirety in the Mine Act. This is important because it's important to me to figure out the structure how to decide your case. If, in fact, the Supreme Court, which it did, took our case on cert, it only took the tort issue. That's correct. So it didn't rule on, if you will, the jurisdictional issue or the waiver of sovereign immunity, right? We didn't seek cert on that question. That's correct. Vacated our opinion. The opinion's gone. Yes. And it has no presidential value. Exactly. There's another doctrine of law of the case that has value to us. Law of the case only applies to opinions that have not been vacated. They only apply to. . . What's your authority for that? Well, we cite several cases in our brief that talk about a case. Law of the case only really applies if there is, if it has precedent, if the prior panel decision has precedential effect. Once a case is vacated, it evaporates. You're ignoring what Judge Clifton talked about. There are issues in cases that are, that have been reversed by prior decisions or by the Supreme Court or subsequent. . . But the law, there may be law of the case buried in there, and you're saying if it's vacant, it's all gone. There is no law of the case once. . . And we can. . . Once. . . And therefore. . . I think you, I would encourage you to look at that to the extent that you find it persuasive. But it's not, it's not binding on this panel. So if it's not law of the case, then our remand to the district court allowed the district court to explore every issue in the case. Absolutely, Your Honor. And this court's remand order didn't limit the district court's opinion. Of course, this is a jurisdictional issue, so that can be raised. . . It was silent about it. But, of course, if this court's, when this court remands, and it's silent. . . We have that, we have a discussion in the footnote in our brief that it didn't. . . I think the case is. . . I'm sorry, Your Honor. It's in a footnote in our brief where we discuss this very issue. The footnote, what is the point of it? Well, the point is that once, as long as you have remanded and you were silent about whether the court could reconsider the discretionary function question, the court was free to consider that issue. Okay, so the next step is when it went back, we said it could take discovery, should take discovery. So the discovery, did it produce some new facts? Well, there were additional declarations from various MSHA officials, including Robert Friend, who discusses this whole, what inspector, the consistent interpretation of MSHA that in its entirety does not mean including areas that have been barricaded off. Generally, they don't inspect those areas. And that, again, goes back to the question of whether Varland, when he went to the mine, had discretion to go into or not go into barricaded areas. Okay, let's slow down right there. Counsel for the appellant says there's disputed issues of fact mixed into what we're talking about here. You say there was no abuse of discretion or they had discretion to do this, so you would trump that, wouldn't you? That's correct, Your Honor. If you lose your trump, then we're back to disputed issues of fact. If there was, if you were to find that Varland had no discretion, that mine inspectors are required to go into areas of the mine that have been closed for years and perhaps decades. I'm not trying to degrade that argument. I'm just saying if that argument isn't there. But then, of course, if there's no discretion, in general, if there's no discretion, if you fail the prong one of the Berkovitz test, then you can go to the second question. You can go to the state law issue. Counsel has raised some pretty interesting questions about the fact of disputed issues of fact for that determination. On the state law issue, the Good Samaritan case, I think there are, again. Before we get to the state law, I wanted to direct your attention to the concluding paragraph of the Supreme Court opinion in which it says, Does the party disagree about precisely which Arizona tort law doctrine applies here? We remand the case so that the lower courts can decide this matter in the first instance. The judgment of the Ninth Circuit is vacated and the case is remanded for proceedings consistent with that opinion. Doesn't that mean that, in effect, it's being remanded to undertake that specific thing that they just discussed? That is, whether the tort law in Arizona is effective, not into the discretionary function? In a word, no, Your Honor. I mean, the discretionary function exception is a jurisdictional issue. It's a jurisdictional question. And, of course, even if we had not raised it before, we could vacate it. We remand the case so that the lower courts can distinguish this matter in the first instance, and that is about the Arizona tort law. That's all they're remanding for. Of course, they were dealing with the limited issue of whether you have to look for a private person analog or you could rely on the liability of a public entity. That didn't address the jurisdictional issue. The jurisdictional issue is a threshold question that this Court under Steele Co. must reach before it gets to the underlying state tort law issue. And so I would say that if we were not to have raised it at all and it came back down and we were to have raised a jurisdictional issue in the first instance, this Court would be obligated under Steele Co. to consider that issue. We've been raising the discretionary function question all along. We didn't seek cert on it. But we raised it again in the trial court, and the court was obligated to take a look at it. It comes very close to what Judge Clipton said, where the Supreme Court will vacate for the purpose of discussing a particular issue. This was not a limited remand. They vacated the Ninth Circuit's decision. If they had left the Ninth Circuit's decision in place and only vacated part of it, they could have, I mean, I don't know what they could have done. They vacated the entire decision, however, and that leaves open. They really have done anything else. Only one question was in front of them, and all they really care about is the bottom line. Well, you can't have judgment in favor of the United States after what they said here, or rather judgment in favor of plaintiff after what they said here. Right. So it's hard to take the Supreme Court's decision as saying much of anything with regard to this. I mean, I think in the end that's the right answer, that the Supreme Court didn't really consider this, wasn't really thinking about this particular issue, and it's open to this court, again, because the Ninth Circuit's earlier panel decision was vacated to reconsider the issue anew. And I think given especially the additional development on remand, particularly the Friend deposition, the Friend declaration, Varlin's declaration that he told, I mean, sorry, Kirk's declaration that he told Varlin to look into these issues, I think that makes, there may be disputed issues of the fact, but they're not material to the discretionary function question. Again, this case is really indistinguishable from this Court's decision in Cunningham, which involved OSHA inspections, and the Supreme Court's decision in Varric Airlines. My time's up. I don't know if you want me to continue on to particular issues. I can discuss the state law issue, Your Honor. Yeah, sure. Yeah, I'd like to know your answer to counsel's comment on the district court's decision relative to the tort issue where he recited that Tenth Circuit case in the federal law, rather than the Arizona 324 issue. Well, I think the district court was applying 324. There's sort of several elements of 324. There's the preamble to 324, which discusses whether one undertakes to provide a service to a particular person. And the court said, no, this is not an undertaking to provide a service. I think the district court was really following this Court's decisions in Roberson and Jeffries, which involved where this Court came out exactly the same way. In fact, I think Roberson involved Arizona law. And those were cases involving they were discussing the Good Samaritan Doctrine. Those were cases involving contracts to do certain services, where the private individual had primary responsibility for safety and the government retained a right for inspection. And there were suits for negligent inspection, just as this one. And this Court said, in both Roberson and Jeffries, that that is not undertaking to provide a service. But even putting that aside, of course, they have to meet the other, even if the district court erred in that respect, they have to meet the other requirements, one of the other requirements of 324A, which are whether it increased the risk of damages. I don't think that's, I don't think that really seriously contended that we. The district court has an extensive discussion of 324 in here, and including the Arizona case of, I can't pronounce it, Papathasus. Papathasus, yeah. So it did discuss those. Yes. So tell me what your analysis is of how the district court used the Arizona. The remand was specifically to find out what the Arizona law. The Supreme Court said, gee, we don't know really what there's a dispute. I mean, it's the parties what the controlling Arizona law is. So you're saying that this analysis is the correct Arizona law in spite of what counsel. No, it's absolutely the correct. I mean, he's applying the language of the restatement. And in particular, he's focusing on the preamble of that part, which talks about undertaking to provide services to another. And he says, well, this is not an undertaking to provide a service to another. He instead said, and that's what this court's reasoning. Why isn't this an undertaking to provide services to the minor? Well, what this court said in Roberson and in Jeffries was in this case, and Roberson, again, I think was a case involving Arizona law. It said this is an undertaking to provide a service to a sarco because all the inspector is doing is ensuring compliance with the regulations. That's not a service to a sarco. There's a whole lot of evidence that the minors were certainly relying on it. The question on reliance isn't simply just general reliance. It's specifically legal reliance. It has to be justifiable. I would point this court to the Sixth Circuit case. It has to be justifiable. You've got mine inspectors coming in. Certainly, they're not coming in for the benefit, really, of the employer. They're coming in to make sure that the minors are protected, are they not? They're coming in for the benefit of the public to ensure the operation, the continued operation of the mining industry. There's an incidental benefit. Stop there. I mean, do you think the legislation was passed to make sure what was coming out of this mine? Was it coal?  Coal? I don't think it was coal. Copper? Do you think that the act was passed to make sure we had a steady supply of copper? I think that's the alternative. There were several purposes. The alternative. I would agree with you if the mining company came in and said, hey, we've lost our mine and if you'd inspected it better, we wouldn't have had this problem, so you government owe us. Now, the statute wasn't set up to protect the mining company. But I don't think it was set up to protect the steady flow of copper, either. It was the minors that caused this. And although I see the statute puts the primary responsibility on the mine operators, as it should, it's just very difficult to escape the possibility, at least, and this is where we get to the question where there's a disputed issue of fact, that the miners themselves were looking to the government because they knew they couldn't trust their employer. Well, it wouldn't be very justifiable. I would point out that the Mine Act puts primary responsibility not just on the mine operator but the mine operator in cooperation with the miners. The government is there. They do four spot checks essentially. There are mining tests in the 1920s than there are in the 2000 aughts. And what's the real difference? We started having mine inspections. The government played a role. I would, again, just point this court to the Sixth Circuit's reasoning in Myers, which talks about whether reliance is justifiable in light of the way that this entire scheme is set up. The scheme isn't set up that there is a federal mine inspector there all the time looking at day-to-day operations. These mines are complicated things. They change every day. And all the government does is they come in four times a year. It's a spot check essentially, like, you know, similar to VARIG. It's not a spot check to examine the whole mine. The entire mine, yes, but it's only four times a year. That's what the statute requires. That's what they do. Of course, in between those quarterly results there may be different things going on. Sorry. I apologize. It would make you feel better if you are a miner to know that four times a year someone is coming in to look at it from the standpoint of safety for them, as opposed to the employer who has certainly some concern for the miners, but also there's a profit problem. Well, for Arizona law, what reliance requires is the miners to have foregone some other remedy, that there has to be some evidence. That's what the case law says in Arizona, that they have to have forewent some other course of action. And there's no evidence here that they would have done something differently if they couldn't rely on the federal mine inspections. And so, I mean, I think that reliance, and the Sixth Circuit case is quite clear about this, that any reliance would be not justifiable. The Sixth Circuit. Yes. It's Myers versus United States. We're talking about Ninth Circuit. Of course. Of course. But, you know, I think the reasoning is quite persuasive in that case. I'm trying to see anything else. I think that's all I have. If there are no further questions. We've given you a sufficient workout, I guess. And we appreciate the guidance you've given us. We'll have a brief rebuttal. I have two minutes, if I might. Okay. Just very briefly. On the remand issue, I think the Court has correctly suggested today, it's the intent of the Court that issues the remand. And this Court is in as good a position or better than either the United States or myself to determine what did the Supreme Court mean when it remanded the case, and what did this Court mean when it remanded it to the district court. I would suggest there's no real evidence that this Court intended to disturb its earlier decision that discretionary function didn't apply in this case. If the Court feels otherwise, I would think all the evidence just further bolsters that decision. The second point, the counsel makes a lot of point about this stope being closed for two years, and I'm sure he wasn't involved in the discovery. This is a mine that actually looks like a clover, and there's hundreds of stopes as you go. So they go through stopes every few weeks. They exhaust or remove the next one, exhaust or remove the next one. Our allegations in this case is that for a long time, for at least all of the time that complaints were being made, ASARCO was doing this dangerous fanback stoping and then taping off the stopes under, you know, under work at the time of the inspections, and that's specifically what the complaint was, and that's specifically what the evidence in the discovery came out was. Varlin said he didn't remember Kirk telling him about that, and Ratliff said there's no – Ratliff was the investigator hired by MSHA, the MSHA district manager himself, who said there's absolutely no evidence that they investigated this, although they should have. So I don't know what discretion, you know, what discretionary choice is being protected here, because Kirk thought, at least Kirk's testimony thought he was saying, you know, look at all of these things, but there's no evidence they looked at that by MSHA's own investigation. And the last thing – Can I stop you right there? Yeah. Am I misreading the record or remembering the record that Varlin at one inspection did look behind some tapes, but not in the one in September? Yeah, I think that there – I think that there is a suggestion, and frankly, this point is cloudy in my mind. I think there was some suggestion in the post-investigation that that – that there was some evidence that that was true, but it's disputed. Okay. Okay. The last point I wanted to make, Your Honor, is I think the Court is misreading Judge Burry's order. When you say Judge Burry talked extensively about 323, if you look at the Court's order, he goes through for about 15 pages talking about what does the defendant say and what does the plaintiff say, and talks about 323 based on the party's contentions. When he then gets to hit the Court's analysis, he makes his decision only on the basis that there were not rendering services, and that's beginning, I believe, at page 33 and then going forward. And so nothing before that is really the Court's own analysis. And the basis for Judge Burry's decision, I maintain, is simply not Arizona law, the public-private basis. And reliance, with all due respect, the Sixth Circuit, whether there was reliance is a fact issue. And we have some pretty good facts here, and we should get our trial on the merits. Thank you. Thank you. Thank both counsel for the argument. The case just argued is submitted. And we move to Citizens for Better Forestry versus the U.S. Department of Agriculture.
judges: Hug, Brunetti, Clifton